Filed 3/23/23  P. v. Sanchez CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>IGNACIO HERNANDEZ SÁNCHEZ,<br><br>　　　Defendant and Appellant. | B322568<br><br>(Fresno County Super. Ct. No. F18902753) |

　　　APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.  Affirmed in part and remanded with directions.

　　　Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

Ignacio Hernandez Sánchez appeals from his judgment of conviction of one count of murder (Pen. Code,[1] § 187, subd. (a)), with a true finding on a firearm enhancement (§ 12022.53, subd. (d)) and admissions to certain prior conviction allegations (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), 667.5, subds. (a), (b)).  On appeal, Sánchez argues the trial court violated his constitutional rights to due process and a fair trial by instructing the jury with CALCRIM No. 315 regarding eyewitness identification testimony. He also asserts sentencing error on the grounds that the trial court did not consider whether to impose a lesser firearm enhancement under section 12022.53; his prior offenses no longer qualify for a prior prison term enhancement under section 667.5, subdivision (b); and the abstract of judgment does not accurately reflect his presentence custody credit.  We conclude the use of CALCRIM No. 315 did not violate Sánchez's constitutional rights, but his sentencing error claims have merit.  We accordingly affirm the conviction and remand the matter for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

## I.    Evidence at Trial

Shortly before midnight on July 9, 2016, David Lemus, the victim in this case, was fatally shot outside the Jet Stop gas station and convenience store in Huron, California.  Huron is a small town in Fresno County whose residents often know one another.  Sánchez, whose nickname was "Giddy," lived in Huron and was known to local law enforcement.  About an hour and a half before the shooting, Huron Police Sergeant Charles Rabaut

---

[1]    Unless otherwise stated, all further statutory references are to the Penal Code.

2

observed Sánchez in an alleyway near the Jet Stop.  Sánchez was wearing a red shirt, white shorts, and a white hat.

About 10 minutes before the shooting, Sukhminder Multani was working at the Chevron gas station and store across the street from the Jet Stop when two men entered the store arguing.  Multani recognized one of the men as a regular customer.  The other man, whom Multani did not know, wore a red shirt and a hat, and appeared to be the aggressor.  Multani asked both men to leave, and they complied.  After a few minutes, Multani saw a physical altercation outside the store near a crowd of people that included the man in the red shirt.  An unidentified man was hit in the face and then fled in his vehicle.  A short time later, Multani was inside the store when he heard a shooting from the direction of the Jet Stop.

A few minutes before the shooting, Roman Plasencia was outside the Jet Stop store smoking marijuana when his friend, Lemus, arrived and parked his car by the gas pumps.  Plasencia walked over to the car and stood by the front passenger window while Lemus stayed in the driver's seat.  As Plasencia was talking to Lemus, he noticed a verbal altercation taking place nearby.  Plasencia knew most of the residents of Huron and was familiar with both Sánchez and his younger brother.  Plasencia observed one of the brothers arguing with the occupant of a van that had stopped by the gas pumps.  That brother yelled the name "Huron Bulldogs" and lifted his shirt to show his tattoos.  Plasencia began walking back toward the store as that same person approached Lemus's car and stopped on the passenger side where Plasencia had been standing.  Moments later, Plasencia heard the sound of arguing and three gunshots.  When Plasencia went back toward the car, he saw Lemus lying on the

ground.  In an interview with the police a few days after the shooting, Plasencia identified photographs of both Sánchez and his younger brother.  Plasencia stated that only one of them had been present at the Jet Stop that night, but he did not know which one because they bore a close resemblance.  While Plasencia initially thought it was the younger brother, he noted that the older brother's girlfriend was also at the scene.

Rosemary Bernal was standing outside the Jet Stop store at the time of the shooting.  She was a longtime resident of Huron and knew both Sánchez and his girlfriend from the neighborhood.  A few minutes before the shooting, Bernal saw Sánchez and two other men walking toward the Jet Stop from the direction of the Chevron station.  She recalled that Sánchez was wearing red shorts, a white shirt, and a white hat.  While Bernal was inside the store, Sánchez's girlfriend walked in and asked the owner if she could use the restroom.  When the owner jokingly stated that she had to pay, the girlfriend responded to "put it on Giddy's tab."  Bernal made a purchase and went outside.  As she was standing in front of the store, Bernal saw Sánchez in an altercation with Lemus near the driver's side of Lemus's car.  After punching Lemus once in the face, Sánchez pulled a gun from his waistband, pointed it at Lemus, and fired three shots.  Sánchez and his companions then ran down the alley.  Lemus tried to get back to his car, but instead fell to the ground.  In a photographic lineup shown to her a few days later, Bernal identified Sánchez as the shooter.  She also told the police that she was familiar with Sánchez's younger brother, and that he was not present at the shooting.

David Sease and his mother were inside the Jet Stop store when the shooting occurred.  Sease knew Lemus through a

mutual friend, but he was not familiar with Sánchez. As his mother stood in line to make a purchase, Sease heard yelling outside. Sease looked through the glass windows of the store and saw a group of men surrounding Lemus's car. Sánchez and another man were standing on the driver's side of the car and a third man was on the passenger side. Sease recalled that Sánchez was short and wearing a red shirt, a red hat, and white shorts. As Lemus sat in the driver's seat, Sánchez reached in and punched him. Lemus then got out of the car. The man on the passenger side walked around and hit Lemus from behind. In response, Lemus approached Sánchez and punched him once in the face. After being momentarily stunned, Sánchez pulled a small black object from his waistband. At that point, Sease ducked down and heard two gunshots. When Sease stood back up, he saw Sánchez and the other men running down the alley, and Lemus stumbling toward his car. Lemus then fell to the ground. In a photographic lineup shown to him several weeks after the shooting, Sease identified Sánchez as the shooter.

Officers from the Huron Police Department responded to the scene minutes after the shooting. As Officer Daniel Garibay was driving to the scene, he observed Sánchez and his brother walking in an alleyway a few blocks from the Jet Stop. Sánchez was wearing a red shirt, white shorts, and a white hat, and he appeared to be reaching his hand toward the front of his waistband.

Once at the Jet Stop, Officer Garibay stayed outside with the wounded Lemus while Sergeant Rabaut went into the store to view surveillance footage of the shooting. While none of the surveillance cameras captured the shooting, they did record a portion of the area near the gas pumps where Lemus's car was

parked.  In reviewing the video of that area, Sergeant Rabaut recognized Sánchez as standing near the front passenger door and then walking around the front of the vehicle.  When Officer Garibay later reviewed the video, he likewise recognized Sánchez.  In the video, Sánchez was wearing the same red shirt, white shorts, and white hat that the officers had seen him in earlier that evening.

Lemus died of a gunshot wound to the front abdomen.  A single bullet was recovered from his body.  During a search of his car, the police found a bullet fragment and an expended shell casing inside the vehicle.  The trajectory of that bullet appeared to be from the front passenger window through the driver's seat headrest into the rear passenger door.  Both the bullet that killed Lemus and the shell casing found in his car were from the same caliber firearm.

At the time of the shooting, Sánchez was on parole and wearing a global positioning system (GPS) device.  His GPS device showed that Sánchez was at the Jet Stop gas station at 11:58 that night.  After the shooting, Sánchez spent the night in Bakersfield and then drove to Los Angeles.  He returned to the Huron area a few days later.

On July 12, 2016, homicide detectives from the Fresno County Sheriff's Department conducted a custodial interview with Sánchez.  Sánchez admitted to the detectives that his nickname was "Giddy," and that he was a member of the Huron Bulldogs gang.  In describing his whereabouts on the night of the shooting, Sánchez stated that he was barhopping with his girlfriend and some other friends.  They had been drinking at a bar across the street from the Chevron station.  When he saw one of his friends running toward the Chevron,

Sánchez followed because he suspected something might be happening there. Sánchez confronted a young man inside the Chevron store, but decided to leave him alone after the store clerk intervened. When Sánchez walked out, he saw that a large crowd had gathered outside the Chevron station around some people who were fighting, and he tried to act as a peacemaker in that fight. The crowd then began walking toward the Jet Stop. Sánchez initially followed the crowd, but changed his mind and walked in the opposite direction through an alley. Sánchez denied going to the Jet Stop, and stated that he was in the alley when he heard the sound of gunfire. When the detectives showed Sánchez a still image of surveillance video taken from the Jet Stop that night, Sánchez admitted that the image was of him, but he continued to deny any involvement in the shooting.

## II. Jury Verdict and Sentencing

The jury found Sánchez guilty of the second degree murder of Lemus. The jury also found true the enhancement allegation that Sánchez intentionally discharged a firearm which caused Lemus's death within the meaning of section 12022.53, subdivision (d). In a bifurcated proceeding, Sánchez admitted the enhancement allegations that he suffered two prior strike convictions (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), served one prior prison term for a violent felony conviction (§ 667.5, subd. (a)), and served three prior prison terms for other convictions (§ 667.5, subd. (b)).

The trial court sentenced Sánchez to a total term of 70 years to life in state prison, consisting of 45 years to life on the murder conviction, plus 25 years to life on the firearm enhancement (§ 12022.53, subd. (d)). The court exercised its discretion to strike each of the prior prison term enhancements

7

(§ 667.5, subds. (a), (b)) in the interest of justice pursuant to section 1385. Sánchez was awarded 1,207 days of presentence custody credit.

Sánchez filed a timely appeal.

## DISCUSSION

## I. The Certainty Factor in CALCRIM No. 315

On appeal, Sánchez contends his constitutional rights to due process and a fair trial were violated when the trial court instructed the jury with CALCRIM No. 315 that an eyewitness's level of certainty is one of the factors to consider in evaluating the reliability of eyewitness identification testimony. In challenging the inclusion of the certainty factor in CALCRIM No. 315, Sánchez argues that the growing body of evidence has shown no correlation between the confidence and the accuracy of an eyewitness's identification. Based on the totality of the record, we conclude that Sánchez's constitutional claim fails.

### A. *Applicable Law*

CALCRIM No. 315, as given by the trial court, lists 15 factors for the jury to consider when evaluating eyewitness identification testimony. One of those factors states: "How certain was the witness when he or she made an identification?"

In *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*), the California Supreme Court considered a due process challenge to the certainty factor in CALCRIM No. 315. The defendant in *Lemcke* was convicted of assault and robbery based on the testimony of a single eyewitness who had no prior relationship with the defendant and expressed certainty in her identification of him as the perpetrator. (*Id*. at p. 666.) In rejecting the defendant's due process claim, the Supreme Court held that "[w]hen considered in the context of the trial record as a whole,

8

listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating identification testimony did not render [the defendant's] trial fundamentally unfair." (*Id*. at p. 646.) As the court explained, CALCRIM No. 315 "does not direct the jury that 'certainty equals accuracy.' [Citations.] Although the language may prompt jurors to conclude that a confident identification is more likely to be accurate, [the defendant] was permitted to call an eyewitness identification expert who explained the limited circumstances when certainty and accuracy are positively correlated. Moreover, the [trial] court provided additional instructions directing the jury that it was required to consider the testimony of the expert witness, that the prosecution retained the burden to prove [the defendant's] identity as the perpetrator beyond a reasonable doubt, and that witnesses sometimes make honest mistakes." (*Lemcke*, at p. 647.)

The Supreme Court acknowledged, however, that "a reevaluation of the certainty instruction is warranted." (*Lemcke*, *supra*, 11 Cal.5th at p. 647.) The court noted that "[c]ontrary to widespread lay belief, there is now near unanimity in the empirical research that 'eyewitness confidence is generally an unreliable indicator of accuracy.' [Citations.] As currently worded, CALCRIM No. 315 does nothing to disabuse jurors of that common misconception, but rather tends to reinforce it by implying that an identification is more likely to be reliable when the witness has expressed certainty." (*Ibid*.) The court accordingly referred the matter to the state Judicial Council to evaluate "whether or how the instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy." (*Ibid*.) The court further directed that "until the

9

Judicial Council has completed its evaluation, trial courts should omit the certainty factor from CALCRIM No. 315 unless the defendant requests otherwise." (*Id*. at p. 648.)

Following *Lemcke*, the Supreme Court in *People v. Wright* (2021) 12 Cal.5th 419 (*Wright*) again considered a challenge to the certainty factor in an eyewitness identification instruction. The jury in *Wright* was instructed with the similarly worded CALJIC No. 2.92, which lists, among other factors to consider, " '[t]he extent to which the witness is either certain or uncertain of the identification.' " (*Wright*, at p. 452.) Applying *Lemcke*, the Supreme Court held that the inclusion of the certainty factor in CALJIC No. 2.92 did not violate the defendant's due process rights. (*Wright*, at p. 453.) The court reasoned that, "[a]lthough the defense below did not present an eyewitness identification expert as had occurred in *Lemcke*, [the] defendant's primary trial strategy was to discredit [the eyewitnesses], and to imply that the eyewitnesses were testifying falsely." (*Ibid*.) The court also observed that, "[t]he instant case involved the identification of defendant by multiple witnesses, and, unlike in *Lemcke*, at least two of the witnesses had known [the] defendant in some capacity prior to the attack." (*Ibid*.)

B. ***The Trial Court's Inclusion of the Certainty Factor in CALCRIM No. 315 Did Not Violate Sánchez's Constitutional Rights***

Sánchez asserts the trial court's inclusion of the certainty factor in CALCRIM No. 315 violated his constitutional rights to due process and a fair trial. As a preliminary matter, we address the People's argument that Sánchez forfeited this claim by failing to object or request a modification of the instruction at trial. An appellate court may review any claim of instructional error that

10

affects a defendant's substantial rights irrespective of whether there was an objection in the trial court. (§ 1259 ["appellate court may also review any instruction given . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"].) Whether the defendant's substantial rights were affected, however, can only be determined by deciding if the instruction as given was flawed and, if so, whether the error was prejudicial. Therefore, we necessarily must review the merits of Sánchez's claim that the instruction violated his constitutional rights. (*People v. Mitchell* (2019) 7 Cal.5th 561, 580 [no forfeiture where defendant claimed that flawed instructions "deprived him of due process . . . because this would affect his substantial rights if true"].)[2]

Viewing CALCRIM No. 315 in the context of the jury instructions and record as a whole, we conclude the trial court's inclusion of the certainty factor in the instruction given to the jury did not violate Sánchez's constitutional rights. As in *Wright*, *supra*, 12 Cal.5th at page 453, this case involved the identification of Sánchez as the perpetrator by multiple witnesses, some of whom knew him prior to the shooting. At trial, two eyewitnesses, Bernal and Sease, made in-court identifications of Sánchez as the person who shot Lemus. Both Bernal and Sease also had identified Sánchez as the shooter in photographic lineups that were shown to them during their police interviews. A third eyewitness, Plasencia, told the police that

---

[2]     Because we find no forfeiture of Sánchez's instructional error claim, we do not reach his argument that his trial counsel's failure to object the certainty factor in CALCRIM No. 315 constituted ineffective assistance of counsel.

11

either Sánchez or his similar-looking brother had been present at the scene and approached Lemus moments before the shooting. Both Plasencia and Bernal also testified that they were familiar with most residents in the small town of Huron, and that they knew Sánchez before the shooting because they would see him around town. In addition to these witnesses to the shooting, two local law enforcement officers testified that they knew Sánchez based on their prior contacts with him, and that they saw him near the Jet Stop shortly before or after the shooting in the same color and type of clothing worn by the perpetrator. At trial, none of the witnesses were asked by either the prosecution or the defense to express a level of certainty in their identifications.

Moreover, in proving Sánchez's identity as the shooter, the prosecution relied heavily on other corroborating evidence that placed him at the scene. The jury was shown the surveillance video of the area near the Jet Stop gas pumps where Lemus's car had been parked. While the camera did not capture the shooting, it did show a person whom the prosecution contended was Sánchez walking around Lemus's car right before the shooting occurred. The jury also heard the audio recording of Sánchez's police interview during which he repeatedly denied that he was at the Jet Stop that night, and then upon being shown a still image taken from the surveillance video, he admitted that the image was of him. In addition, the jury was presented with evidence that Sánchez's GPS tracking device placed him at the exact location of the Jet Stop right around the time of the shooting.

In challenging the certainty factor in CALCRIM No. 315, Sánchez argues the instruction violates due process because it "lessens the prosecution's burden of proof by allowing the jury to

12

use improper factors unrelated to accurate identification," and "has a negative effect on the defendant's ability to present his defense to counter the eyewitness identifications." These same arguments, however, were expressly rejected by the Supreme Court in *Lemcke*. In response to the claim that CALCRIM No. 315 lowered the prosecution's burden of proof, the *Lemcke* court explained that "the instruction merely lists the witness's level of certainty at the time of identification as one of 15 different factors that the jury should consider," and "leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors." (*Lemcke*, *supra*, 11 Cal.5th at p. 657.) The *Lemcke* court likewise rejected the claim that the instruction denied the defendant a meaningful opportunity to present a defense because the record showed that he "was permitted to put on a vigorous defense on the issue of identity" through expert testimony and cross-examination on the reliability of the eyewitness's identification. (*Id.* at p. 660.)

Here, the record demonstrates that Sánchez was able to present a vigorous defense on the issue of identity by challenging the credibility of the various eyewitnesses on cross-examination and eliciting inconsistencies in their testimony. Additionally, as in *Lemcke*, *supra*, 11 Cal.5th at page 658 and *Wright*, *supra*, 12 Cal.5th at page 453, the instructions as a whole properly explained to the jury how to evaluate the evidence presented. The trial court instructed the jury on the defendant's presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt. The court also instructed the jury with respect to witness testimony that "[p]eople sometimes honestly . . . make mistakes about what they remember," and

13

that the jurors "alone must judge the credibility or believability of the witnesses." CALCRIM No. 315, as given to the jury, further reiterated the burden of proof with respect to identity, stating: "The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

On this record, the trial court's inclusion of the certainty factor in the eyewitness identification instruction given to the jury did not render the trial fundamentally unfair or otherwise violate Sánchez's due process rights.

## II. Discretion to Impose Lesser Uncharged Enhancements Under Section 12022.53

Sánchez contends the matter must be remanded for resentencing because the trial court did not understand the scope of its discretion to strike the enhancement found true by the jury under section 12022.53, subdivision (d), and to impose a lesser enhancement under section 12022.53, subdivision (b) or (c). We agree that remand is appropriate following the Supreme Court's decision in *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*).

### A. *Applicable Law*

Section 12022.53 establishes a tiered system of sentencing enhancements for certain felonies involving firearms. (*Tirado*, *supra*, 12 Cal.5th at p. 693.) Subdivision (b) of the statute mandates the imposition of a 10-year enhancement for the personal use of a firearm in the commission of one of those felonies; subdivision (c) requires the imposition of a 20-year enhancement for the personal and intentional discharge of a firearm; and subdivision (d) provides for a 25-year-to-life enhancement for the personal and intentional discharge of a

14

firearm causing great bodily injury or death to a person other than an accomplice.  (§ 12022.53, subds. (b)–(d).)

Effective January 1, 2018, the Legislature amended section 12022.53, subdivision (h), to give trial courts the discretion to strike or dismiss a firearm enhancement in the interest of justice.  (Stats. 2017, ch. 682, § 2.)  While section 12022.53, subdivision (h), as amended, authorized a court to strike a section 12022.53, subdivision (d) enhancement entirely and impose no additional punishment under the statute, the question remained whether the court could instead strike the section 12022.53, subdivision (d) enhancement and impose a lesser enhancement under section 12022.53, subdivision (b) or (c), even if the lesser enhancement was not charged in the information or found true by the jury.

During the pendency of this appeal, the Supreme Court issued its decision in *Tirado*, *supra*, 12 Cal.5th at page 696, which resolved a split that had developed among the Courts of Appeal as to the scope of the trial court's discretion to impose a lesser, uncharged enhancement under section 12022.53.  The court concluded that "the statutory framework permits a court to strike the section 12022.53(d) enhancement found true by the jury and to impose a lesser uncharged statutory enhancement instead." (*Tirado*, at p. 692.)  Thus, "[w]hen an accusatory pleading alleges and the jury finds true the facts supporting a section 12022.53(d) enhancement, and the court determines that the section 12022.53(d) enhancement should be struck or dismissed under section 12022.53(h), the court may . . . impose an enhancement under section 12022.53(b) or (c)." (*Id*. at p. 700.)

15

**B.** *The Matter Must Be Remanded for the Trial Court to Consider Whether to Impose a Lesser Enhancement Under Section 12022.53*

In this case, the People alleged, and the jury found true, the section 12022.53 subdivision (d) enhancement that Sánchez had personally and intentionally discharged a firearm which proximately caused Lemus's death. At Sánchez's November 1, 2019 sentencing hearing, the trial court stated that it understood it had "newly granted discretion to strike or stay such an enhancement," and that it was declining to strike the enhancement. However, in sentencing Sánchez to an additional 25-year-to-life term under section 12022.53, subdivision (d), the trial court did not state whether it had considered imposing a lesser enhancement under section 12022.53, subdivision (b) or (c).

The People assert that Sánchez forfeited his claim that the trial court failed to properly exercise its discretion under section 12022.53 because he never objected to the firearm enhancement at sentencing. Generally, " '[a] party in a criminal case may not, on appeal, raise "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" if the party did not object to the sentence at trial.' " (*People v. Scott* (2015) 61 Cal.4th 363, 406.) " 'In determining whether the significance of a change in the law excuses counsel's failure to object at trial, we consider the "state of the law as it would have appeared to competent and knowledgeable counsel at the time of the trial." ' " (*People v. Perez* (2020) 9 Cal.5th 1, 8.) In this case, at the time of Sánchez's sentencing, the law was unsettled as to whether a trial court had any discretion to strike a section 12022.53, subdivision (d) enhancement and to impose a lesser, uncharged enhancement instead. (Compare *People v. Morrison*

16

(2019) 34 Cal.App.5th 217, 223 [finding discretion] with *People v. Tirado* (2019) 38 Cal.App.5th 637, 643 [finding no discretion], reversed by *Tirado*, *supra*, 12 Cal.5th 688.) Given the uncertainty in the law at the time, we find no forfeiture in Sánchez's failure to object to his sentence.[3]

The People also argue that remand is not warranted because the record reflects that the trial court properly understood its discretion to impose a lesser enhancement and declined to exercise such discretion. " 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) When a court is unaware of the scope of its discretion, it cannot exercise that informed discretion. (*Ibid*.) "In such circumstances, . . . the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*Ibid*.) Here, the record does not clearly indicate that the trial court understood it had discretion to impose a lesser, uncharged enhancement under section 12022.53, or that it would have declined to do so even if it had been aware of the full scope of its discretion. Under these circumstances, remand is required for the trial court to determine whether to exercise its discretion to strike the section 12022.53, subdivision (d) enhancement and to impose a lesser enhancement under section 12022.53, subdivision (b) or (c). We express no

_____

[3] Because we find that Sánchez did not forfeit his claim that the trial court failed to understand the scope of its discretion under section 12022.53, we need not address his argument that he received ineffective assistance of counsel based on his trial counsel's failure to object to the sentence.

17

opinion on how the trial court should exercise its discretion on remand.

### III. The Section 667.5, Subdivision (b) Enhancements Must Be Stricken

Sánchez argues the three 1-year enhancements that the trial court found to be true under section 667.5, subdivision (b), must be vacated because his prior convictions no longer qualify for a sentence enhancement under Senate Bill No. 136 (2019–2020 Reg. Sess.) (Senate Bill 136). The People acknowledge that Sánchez is entitled to the benefit of Senate Bill 136, but contend that we should remand the case for resentencing rather than vacate or strike the enhancements. Because the matter is being remanded to the trial court to exercise its discretion under section 12022.53, we conclude the proper remedy is for the trial court to strike the section 667.5, subdivision (b) enhancements on remand.

At the time of Sánchez's November 1, 2019 sentencing, section 667.5, subdivision (b) required trial courts to impose a one-year sentence enhancement for each true finding on an allegation that the defendant had served a separate prior prison term and had not remained free of custody for at least five years. (§ 667.5, former subd. (b).) Trial courts nevertheless had the discretion to strike a prior prison term enhancement pursuant to section 1385, subdivision (a). (*People v. Jennings* (2019) 42 Cal.App.5th 664, 681.) Effective January 1, 2020, Senate Bill 136 amended section 667.5, subdivision (b), to limit the applicability of the enhancement to defendants who served a prior prison term for a sexually violent offense, as defined in Welfare and Institutions Code section 6600, subdivision (b). (Stats. 2019, ch. 590, § 1.) As the People concede, Senate Bill 136

18

applies retroactively to Sánchez because the judgment in his case is not final and none of his prior convictions was for a sexually violent offense. (*People v. Choi* (2021) 59 Cal.App.5th 753, 769; *People v. Winn* (2020) 44 Cal.App.5th 859, 872.)

While the parties agree that Sánchez is entitled to the benefit of Senate Bill 136, they dispute the proper remedy given that, at Sánchez's sentencing, the trial court exercised its discretion to strike the prior prison term enhancements in the interest of justice pursuant to section 1385. Sánchez argues the true findings on the section 667.5, subdivision (b) enhancements must be vacated because the trial court no longer has discretion to impose punishment for those enhancements. The People assert the case should be remanded to allow the trial court to reassess Sanchez's total sentence in light of the change in the law effectuated by Senate Bill 136. Because Sánchez's prior convictions are for offenses that no longer qualify for a sentence enhancement under section 667.5, subdivision (b), the three 1-year prior prison term enhancements are unauthorized by law and must be stricken. (*People v. Morelos* (2022) 13 Cal.5th 722, 770; *People v. Choi*, *supra*, 59 Cal.App.5th at pp. 769–770.) Accordingly, in addition to any other changes that may be ordered on remand, the trial court is directed to strike each of the section 667.5, subdivision (b) enhancements.

## IV. Sánchez Is Entitled to an Additional Day of Presentence Custody Credit

Lastly, Sánchez asserts, and the Attorney General agrees, the judgment must be modified to accurately reflect Sánchez's presentence custody credit. Section 2900.5, subdivision (a), provides that a defendant is entitled to receive full credit for actual confinement time prior to the commencement of the

sentence.  At his sentencing, Sánchez was awarded 1,207 days of presentence custody credit.  However, because Sánchez was taken into custody on July 12, 2016, and was sentenced on November 1, 2019, he is entitled to one additional day of presentence custody credit for a total of 1,208 days.  Therefore, on remand, the trial court is directed to modify the judgment to reflect an award of 1,208 days of presentence custody credit.

## DISPOSITION

The conviction is affirmed.  The matter is remanded to the trial court with directions (1) to determine whether to exercise its discretion to strike the section 12022.53, subdivision (d) enhancement and impose a lesser enhancement under section 12022.53, subdivision (b) or (c); (2) to strike each of the section 667.5, subdivision (b) enhancements; and (3) to modify the judgment to reflect an award of 1,208 days of presentence custody credit.


VIRAMONTES, J.


We concur:



GRIMES, Acting P. J.



WILEY, J.


20